## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VIRGINIA SILANO, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:13-CV-00185 (JCH) |
| | : | |
| v. | : | |
| | : | |
| DANIEL WHEELER, | : | FEBRUARY 5, 2015 |
| Defendant. | : | |
| | : | |

**RULING RE: PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 104, 130, 131) and DEFENDANT'S MOTIONS TO DISMISS (Doc. No. 56) and FOR SUMMARY JUDGMENT (Doc. No. 125)**

## I.    INTRODUCTION

This case arises out of the defendant police officer's arrests of the plaintiff following a series of disputes between the plaintiff and her neighbor.  Based on these arrests, plaintiff Virginia Silano brought this action pro se against defendant Daniel Wheeler, an officer of the Trumbull Police Department (the "TPD"), under section 1983 of title 42 of the United States Code, alleging wrongful arrest, malicious prosecution, selective enforcement, and (maybe) intentional infliction of emotional distress.  See generally Am. Compl. (Doc. No. 35-1).

Wheeler filed a Motion to Dismiss (Doc. No. 56).  Silano filed an Objection and Memorandum of Law to Defendant's Motion to Dismiss (Doc. Nos. 104, 130) ("Pl.'s Obj. Mot. Dismiss"), in which she also requested summary judgment in her favor.  Wheeler then responded with his own Motion for Summary Judgment (Doc. No. 125).  Finally, Silano filed an Objection and Cross Motion for Summary Judgment (Doc. No. 131) ("Pl.'s Obj. Summ. J.").

1

For the reasons that follow, Wheeler's Motion for Summary Judgment is granted, and Silano's Motions for Summary Judgment are denied.

## II.    FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements[1] and the evidence filed in support thereof.[2]   Although the parties dispute a number of facts, those disputes are either immaterial or unsupported by admissible evidence.

On June 25, 2010, Wheeler responded to a call regarding an incident between Silano and man who lived near her, Thomas Chetlen.  Def.'s Rule 56(a)1 Statement ¶ 38 (Doc. No. 125-1).  Following the incident, Silano filed an internal affairs complaint against Wheeler.  Id.  A report signed by Lieutenant Thomas Savarese on September 24, 2010, indicated that Silano's complaint was unfounded.  Id.  On January 20, 2011, Chief Thomas Kiely signed a document prepared by Savarese regarding the disposition of Silano's complaint against Wheeler, although it is unclear what this document contained because Silano redacted most of it.  See Pl.'s Ex. 131-P.

---

[1] Despite Wheeler's Notice (Doc. No. 126) informing Silano of the requirements of Local Rule 56, Silano did not file a Local Rule 56(a)2 Statement.  She devoted a section of her Objection and Cross Motion for Summary Judgment to disputing certain facts asserted in Wheeler's Local Rule 56(a)1 Statement but, for the most part, failed to cite admissible evidence in support of those denials.  See Pl.'s Obj. Summ. J. 4–7.   Given that Silano is acting pro se, the court takes into account Silano's version of the facts as stated in her filings to the extent it is supported by admissible evidence.  See Dubuis v. United States, No. 3:06CV01443 DJS, 2008 WL 410429, at *1 (D. Conn. Feb. 12, 2008) (citing Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)).  The court deems admitted all facts in Wheeler's Rule 56(a)1 Statement that are not disputed in Silano's filings and supported with admissible evidence.

[2] Silano filed two sets of exhibits in support of her Motions for Summary Judgment.  However, both are labeled alphabetically with no distinguishing characteristics (e.g., both sets are labeled as Exhibit A, Exhibit B, etc.).  To distinguish between different exhibits with the same label, the court includes the document number of the filing with which the exhibit included (e.g., Exhibit 130-A refers to Exhibit A filed with Silano's document number 130 filing).

On August 10, 2010, Daniel Silva, another officer of the TPD, responded to a call concerning another conflict between Silano and Chetlen.  See Def.'s Rule 56(a)1 Statement ¶ 1.  Silano told Silva that she would shoot Chetlen if she saw him around her property, stating, "I would not shoot him center mass, I would shoot him in the head and I am a damn good shot."  Id.  On September 3, 2010, Silano filed a written complaint against Silva, in which she confirmed that she had said this to Silva.  Id. ¶ 2; Pl.'s Rule 56(a) Statement (Doc. No. 131) ¶ 12, at 25.  Based on these statements, a warrant was applied for, but a state's attorney denied the application.  Def.'s Rule 56(a)1 Statement ¶ 3.

On January 10, 2011, Silano contacted the TPD regarding yet another run-in with Chetlen.  Id. ¶ 4.  Wheeler responded to the call with Michael Pires, another TPD officer. Id.  After Wheeler and Pires arrived, Silano told them that she had found Chetlen peering into her window after she walked out of her front door.  Id. ¶ 5.  Silano reported that she and Chetlen had had a verbal exchange before she retreated into her house to call the TPD.  Id.  According to Wheeler, Silano reported to him that, "I told [Thomas Chetlen] – I told him that I told your department and I told him I have a firearm, I have a license, and I have a permit.  The gun is registered.  I said if you are ever around my property I will shoot him."  Id. ¶ 7.  Wheeler provided an ICOP recording of this interaction and a transcript of the recording.  See Def.'s Ex. E (transcript of ICOP

recording); Def.'s Ex. S (ICOP recording).[3]  The transcript reflects the previously quoted

statement.  See Def.'s Ex. E, at 6–7.  While the audio on the ICOP recording is not

perfectly clear, it sounds as if Silano said to Wheeler,

> I told him he was a psycho.  I told him if I – I told him, as I have told your
> department and I have told him: I have firearms, I have a license – I mean
> I have a permit – this gun is registered.  I catch him in or around my
> property, I will shoot him, because you're not protecting me from him.

Def.'s Ex. S, at 17:14:40–17:14:55.

Silano denies that she ever told Chetlen she would shoot him, and she denies

reporting to Wheeler that she had directly threatened Chetlen.  Pl.'s Obj. Summ. J. 7.[4]

She also claims that she identified a witness who had overseen the exchange between

her and Chetlen.  See Pl.'s Obj. Mot. Dismiss 5–6; Pl.'s Ex. 131-A, Silano Aff. ¶ 13.  She

admits, however, that she told Wheeler that, if she found Chetlen around her property,

she would shoot him.  See Pl.'s Obj. Mot. Dismiss 5–6.  Silano owns a Smith & Wesson

.22 caliber revolver, but she does not have a valid permit to carry it.  See Def.'s Rule

56(a)1 Statement ¶ 8; see also Def.'s Ex. E, at 9.

---

[3] The video camera was positioned to look out of the front window of the police cruiser, so the video does not capture the interaction.  However, the audio recording captures the conversation between Silano and Wheeler.

[4] In fact, Silano disputes the accuracy and authenticity of the entire ICOP video submitted by Wheeler.  Id.  However, aside from an unadorned statement that she has "met with an expert who has rendered the preliminary opinion that the audio is not a genuine copy of the original," she provides no admissible evidence to support an attack on the recording's authenticity.  Notably, in addition, Silano admits that she had ingested a prescription Vicodin prior to the officers' arrival and that it impaired her recollection of the exchange with them.  See Def.'s Rule 56(a)1 Statement ¶ 9; Def.'s Ex. A., Silano Dep 148–49.  Indeed, in a previous proceeding, Silano advised others to "rely on the ICop . . . .  Because the Vicodin would immediately start to cloud my mind."  Id. at 133–34.  In any event, Wheeler provided authentication for the ICOP video.  See Def.'s Ex. AA, Wheeler Aff.; Def.'s Ex. BB, Smith Aff.

The following day, January 11, 2011, Chetlen provided a sworn statement to Wheeler, stating that Silano had threatened to shoot him the day before, he was scared that Silano would, in fact, shoot him, and he wanted to press charges.  See Def.'s Rule 56(a)1 Statement ¶ 10; Def.'s Ex. F.  After receiving Chetlen's statement, the TPD Detective Bureau reviewed the case and recommended that a warrant be applied for. See Def.'s Rule 56(a)1 Statement ¶ 11.  On January 26, 2011, Wheeler applied for such a warrant, which alleged one count of threatening in the second degree and one count of breach of peace.  Id. ¶ 12; Conn. Gen. Stat. §§ 53a-62 (Threatening in the Second Degree), 53a-181(Breach of Peace).  The warrant was signed by a state's attorney on February 4, 2011, and by a judge on February 10, 2011.  See Def.'s Ex. I.  Silano was arrested pursuant to the warrant on February 10, 2011.  See id. at 2.

Another incident occurred between Chetlen and Silano on February 8, 2011. That evening, Wheeler and Lee responded to a call regarding a disturbance at the Pinewood Lake Association clubhouse (the "Clubhouse").  See Def.'s Rule 56(a)1 Statement ¶¶ 19–20.  The officers arrived at the scene to find cushions scattered on the ground.  See id. ¶ 21; Def.'s Ex. J at 2.  Wheeler spoke to Chetlen, who told him that he and Verespy had been carrying cushions from the Clubhouse to Chetlen's vehicle in the Clubhouse's parking lot when he saw Silano in her vehicle with a silver-colored gun pointed at him.  See Def.'s Rule 56(a)1 Statement ¶¶ 15–16.  Lee spoke to Verespy, who said that he saw someone in a dark car with something in her hand and heard Chetlen say "she has a gun."  Id. ¶¶ 22, 24.  The men stated that they ran into the Clubhouse and locked themselves in a closet.  Id. ¶ 19.  Verespy had never met Silano.

5

Id. ¶ 25.  Lee informed Wheeler that Clubhouse staff told him that no security cameras would have captured the incident.  Id. ¶ 26.[5]

After speaking with Chetlen and Verespy, the officers drove to Silano's house. Id. ¶ 28.  Silano and Wheeler dispute much of the contents of the conversation that followed.  According to Wheeler, Silano confirmed that she had been parked next to Chetlen's vehicle at the Clubhouse.  Id. ¶¶ 28–29.  Silano disputed that she brandished a firearm, instead saying that she was at the Clubhouse searching for her cat.  Id. ¶ 28. Silano also told Wheeler that she and Chetlen had had a verbal exchange, and that she had warned Chetlen that, if he approached her vehicle, she would consider it a threat. Id. ¶ 31.  Under Wheeler's story, Silano ultimately told him and Lee that she had nothing else to say and directed them to arrest her.  Id. ¶ 32.  Lee then handcuffed Silano.  Id. ¶ 36.  The officers then saw Silano's revolver in plain view while escorting Silano to her bedroom closet so that she could retrieve shoes.  Id. ¶ 34.

Silano disputes several aspects of Wheeler's account of the incident on February 10, 2011, and the arrest that followed.  Worth noting here, she states that there was a video camera that captured the incident and that Wheeler omitted a third witness, George Cooney, from his report – a witness who purportedly informed Wheeler that there was a security camera present.  Pl.'s Obj. Mot. Dismiss 9.  Silano states that Cooney made the 911 call after finding Verespy and Chetlen locked in a closet at the

---

[5] Silano argues that Lee's statement to Wheeler, as recorded in the police report, is hearsay. However, the statement is admissible for the purpose of showing its effect on Wheeler's state of mind. See Fed. R. Evid. 801(c); see also Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 66 (2d Cir. 2003) ("Because these statements are not used to prove the truth of the matter asserted, but to establish [a person's] state of mind, they are not hearsay.").

clubhouse.  Id.  Silano provides a transcript of Cooney's testimony at a prior court proceeding, and this testimony states that, after an officer had explained where the incident occurred, Cooney told the officer there was a way to view security footage, but that he would have to go home and get his laptop to do so.  See Pls.' Ex. 131-U, at 13– 14.  According to Cooney, the officer left after telling Cooney to get his laptop.  See id. She also states that she "observed [Wheeler] speaking with Thomas Chetlen about the surveillance video on 2/8/11 while [she] was handcuffed and seated in the back of the police cruiser."  Pl.'s Ex. 131-A ¶ 17; see also Pl.'s Obj. Summ. J. 9 n.2.  Further, she provided an affidavit from her husband, Gregory Marconi, in which he states that, on the day after the incident, he told a police detective that the clubhouse has security cameras.  See Pl.'s Ex. 130-G, Marconi Aff.  Silano also provided a copy of the alleged security footage, albeit unauthenticated.  Ex. 131-V.  Unrelated to the security camera, Silano states that she never saw Verespy while she was parked at the clubhouse.  See Pl.'s Ex. 131-A, Silano Aff. ¶ 16.  Finally, Silano denies that she directed Wheeler to arrest her, stating, "I never requested that the Defendant arrest me on 2/8/11."  Pl.'s Ex. 130-G, Silano Aff. ¶ 7.  I merely indicated to Defendant that I would not resist arrest since it was his desire and intent to arrest me in my home."  Pl.'s Ex. 130-G.

Silano was arrested and charged with carrying a pistol without a permit, having a weapon in a motor vehicle without a permit, breach of peace, threatening in the second degree, and reckless endangerment in the first degree.  See Def.'s Rule 56(a)1 Statement ¶ 37.  In May 2012, Silano was acquitted of all charges – those resulting from

both the January 10, 2011, and February 8, 2011, incidents – after a bench trial.  Id. ¶ 39.

## III.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In Re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  "[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F .3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

## IV.    DISCUSSION

Wheeler presents four arguments in support of his Motion for Summary Judgment: (1) Silano's claims relating to the February 8, 2011, incident are barred by the statute of limitations; (2) Silano's arrests following the incidents on January 10, 2011, and February 8, 2011, were both supported by probable cause; (3) Silano fails to provide any evidence – or even allege – that she was treated differently from similarly

8

situated persons; (4) Wheeler is entitled to qualified immunity; and (5) Silano cannot

succeed on an intentional infliction of emotional distress claim because it is based upon

arrests that were supported by probable cause.[6]

The court concludes that there are no genuine issues as to the material facts and

that, as a matter of law: (1) Silano's claims were timely; (2) Wheeler had probable cause

to arrest Silano on both January 10, 2011, and February 8, 2011; (3) Silano neither

alleged, nor provided evidence to sustain, an equal protection claim; and (4) to the

extent Silano asserts an intentional infliction of emotional distress claim, it fails.

A.    Timeliness

Wheeler argues that Silano's claims with respect to the incident on February 8,

2011, are untimely.  Federal courts look to state personal injury law to determine the

applicable statute of limitations for claims made under section 1983, but federal law

determines when a federal claim accrues.  See Wallace v. Kato, 549 U.S. 384, 387–88

(2007); Lounsbury v. Jeffries, 25 F.3d 131, 134 (2d Cir. 1994).

Silano brings this action under section 1983.  See Am. Compl., Count One ¶ 3.

"When a § 1983 action is filed in the District of Connecticut, it is subject to a three-year

state of limitations." Walker v. Jastremski, 159 F.3d 117, 119 (2d Cir. 1998) (citing

Lounsbury, 25 F.3d at 134); see also Conn. Gen. Stat. § 52-577 (Connecticut's personal

injury statute of limitations).  "Under federal law, a cause of action generally accrues

when the plaintiff knows or has reason to know of the injury that is the basis of the

---

[6] The court addresses both Wheeler's Motion to Dismiss and Motion for Summary Judgment.

action."  M.D. v. Southington Bd. of Educ., 334 F.3d 217, 221 (2d Cir. 2003) (internal

quotations marks omitted).  "[T]he statute of limitations upon a § 1983 claim seeking

damages for a false arrest in violation of the Fourth Amendment, where the arrest is

followed by criminal proceedings, begins to run at the time the claimant becomes

detained pursuant to legal process."  Wallace, 549 U.S. at 397.  A claimant becomes

"held pursuant to such process when—for example, he is bound over by a magistrate or

arraigned on charges."  Id. at 389; see also Vilchel v. Connecticut, 3:07-CV-1344(JCH),

2009 WL 179804, at *2 (D. Conn. Jan. 23, 2009).

Here, Silano was arrested on February 8, 2011, and arraigned on February 18,

2011.  See Am Compl. ¶ 27; Def.'s Mem. Supp. Mot. Dismiss, Ex. A at 3 ("[Silano] was

given a court date of 2-18-2011 . . . .").  Silano filed her Motion to Amend Complaint –

with her proposed Amended Complaint attached – to add the claims related to her

February 8, 2011 arrest on December 26, 2013, and the court granted that Motion on

February 19, 2014.

Thus, using the date on which Silano filed her Motion to Amend, the claims would

timely.  However, using the date on which the court granted her Motion, the claims

would be untimely unless they relate back. "[W]hile there does not appear to be any

Second Circuit authority directly on point, several courts have held that the filing of a

motion for leave to file an amended complaint tolls the statute of limitations even though

the amended complaint will not be filed under after the court rules on the motion."

Johnson v. U.S. Dep't of Homeland Sec., No. 3:09-CV-975, 2010 WL 1486910, at *1

(N.D.N.Y. Apr. 14, 2010) (citing Schillinger v. Union Pac. R. Co., 425 F.3d 330, 334 (7th

Cir. 2005); <u>Moore v. State of Ind.</u>, 999 F.2d 1125, 1131 (7th Cir. 1993); <u>Mayes v. AT & T Info. Sys., Inc.</u>, 867 F.2d 1172, 1173 (8th Cir. 1989); <u>Shirk v. Fifth Third Bancorp</u>, No. 05-CV-049, 2008 WL 4449024, at *18 (S.D. Ohio Sept. 26, 2008)).

Absent any Second Circuit precedent to the contrary, the court will follow these cases and apply the date on which Silano filed her Motion to Amend. Doing so is especially appropriate in a case like this one, where Silano attached a copy of her proposed Amended Complaint to her Motion to Amend. Therefore, Silano brought her claims within three years of the conduct of which she complains.

     B.    <u>Probable Cause</u>

Wheeler arrested Silano twice in this case, each arising out of a different incident. Wheeler argues that he had probable cause to arrest Silano on each occasion. The court agrees because, based on the undisputed evidence submitted by the parties, no reasonable juror could find that Wheeler was without probable cause to arrest Silano on either occasion.

The existence of probable cause is a complete defense to section 1983 claims of false arrest and malicious prosecution in violation of the Fourth Amendment. <u>See</u> <u>Weinstock v. Wilk</u>, 296 F. Supp. 2d 241, 247–48 (D. Conn. 2003). "Probable cause exists when there are facts and circumstances sufficient to warrant a prudent man that the suspect had committed or was committing an offense." <u>Lowth v. Town of Cheektowaga</u>, 82 F.3d 563, 569 (2d Cir. 1996) (internal quotation marks omitted). Generally, "courts 'consider only information the officer relied on in concluding there was probable cause' and whether it was reasonable, based on that information, for the

11

officer to conclude that probable cause existed." Stone v. Town of Westport, 411 F.

Supp. 2d 77, 87 (D. Conn. 2006) (quoting Caldarola v. Calabrese, 298 F.3d 156, 168

(2d Cir. 2002)).  Probable cause can come from information given by "some person,

normally the putative victim or eyewitness, who it seems reasonable to believe is telling

the truth."  Id.  "Furthermore, the veracity of citizen complainants who are the victims of

the very crime they report to the police is assumed."  Crocco v. Advance Stores Co.

Inc., 421 F. Supp. 2d 485, 506 (D. Conn. 2006) (internal alterations omitted).  "Once a

police officer has a reasonable basis for believing there is probable cause, he is not

required to explore and eliminate every theoretically plausible claim of innocence before

making an arrest."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).

"[A]n arresting officer's state of mind (except for the facts that he knows) is

irrelevant to the existence of probable cause . . .  [H]is subjective reason for making the

arrest need not be the criminal offense as to which the known facts provide probable

cause."  Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  Further, "a claim for false

arrest turns only on whether probable cause existed to arrest a defendant, and that it is

not relevant whether probable cause existed with respect to each individual charge, or,

indeed, any charge actually invoked by the arresting officer at the time of arrest."

Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

### 1.     The Incident on January 10, 2011

Wheeler obtained a warrant for her arrest following the incident on January 10,

2011.  See Def.'s Rule 56(a) Statement ¶¶ 12–14.  "Normally, the issuance of a warrant

by a neutral magistrate . . . creates a presumption that it was objectively reasonably for

12

the officer[ ] to believe that there was probable cause." <u>Golino</u>, 950 F.2d at 870.  "[A]

reviewing court must accord considerable deference to the probable cause

determination of the issuing magistrate."  <u>Walczyk v. Rio</u>, 496 F.3d 139, 157 (2d Cir.

2007).  Whether an affidavit in support of an arrest warrant demonstrates probable

cause is a question of law.  <u>See</u> <u>id.</u>

i.        Facial Validity of the Arrest Warrant

Wheeler argues that he had probable cause to arrest Silano for threatening in the

second degree.  Section 53a-62(a) of the Connecticut General Statutes provides that:

> A person is guilty of threatening in the second degree when: (1) By
> physical threat, such person intentionally places or attempts to place
> another person in fear of imminent serious physical injury, (2) such person
> threatens to commit any crime of violence with the intent to terrorize
> another person, or (3) such person threatens to commit such crime of
> violence in reckless disregard of the risk of causing such terror.

The undisputed evidence shows that Wheeler had probable cause to arrest Silano

under section 53a-62(a)(3).

Wheeler reported the following facts in the affidavit he submitted in support of the

application for a warrant for Silano's arrest.  <u>See</u> Def.'s Ex. H, at 2 (the "Warrant

Affidavit").  Wheeler and Pires responded to Silano's call on January 10, 2011.  <u>See</u> <u>id.</u>

While Silano explained what had occurred between her and Chetlen, she informed

Wheeler that she possessed firearms and that she had told Chetlen she would shoot

him if she caught him in or around her property.  <u>See</u> <u>id.</u>[7]  Further, on January 11, 2011,

---

[7] As the court noted in its Factual Background, there may be some discrepancy between the
ICOP audio and the transcript.  <u>See</u> <u>supra</u> pp. 3–4.  However, to the extent any such discrepancy exists,

13

Chetlen reported to Wheeler that Silano had threatened to shoot him and that he felt threatened because he had heard that Silano and her husband owned guns.  See id. at 3; see also Def.'s Ex. F.  Months earlier, in an internal affairs complaint against Officer Silva dated September 3, 2011, Silano wrote the following:  "I did state to Officer Silva that if I caught Mr. Chetlen in or around my property again, I would shoot him.  I would not shoot him center mass, I would shoot him in the head and I am a damn good shot."  See Def.'s Ex. H, at 2; see also Def.'s Ex. B, at 3.  Based on these facts as stated in the Warrant Affidavit, the warrant application was executed by a state's attorney and a state court judge.  See Def.'s Ex. I.  On its face, the Warrant Affidavit demonstrates probable cause to arrest Silano as a matter of law.  See Walczyk v. Rio, 496 F.3d at 157 ("[W]hether [an] affidavit[ ], on [its] face, . . . demonstrate[s] probable cause, is a question of law.").

### ii.    Alleged Omissions and Misstatements

Silano does not seem to challenge that the Warrant Affidavit, as written, states probable cause.  Instead, she argues that Wheeler obtained a warrant by misstating and omitting material facts.  A plaintiff attempting to show that a warrant "was issued on less than probable cause faces a heavy burden" by making a "'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'"  Golino, 950 F.2d at 870.  Likewise, a

---

it is immaterial.  The court also notes that the ICOP recording shows that Silano stated to Wheeler, "I don't have a license to carry [a gun], but [Chetlen] doesn't know that."  Def.'s Ex. E, 8:2–3.

plaintiff may also show that the officer made "intentional or reckless omissions of material information, and recklessness may be inferred where the omitted information was critical to the probable cause determination." Id. at 871 (internal citations omitted). An officer loses qualified immunity when he "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause." Id.

The materiality of misstatements or omissions involves a mixed question of law and fact. See Walczyk, 496 F.3d at 158; see also Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994). Whether omitted or misstated information "'is relevant to the probable cause determination' is a question of law." Walczyk, 496 F.3d at 158 (quoting Velardi, 40 F.3d at 574). If misstated or omitted information is relevant, then "questions of fact may arise as to what weight . . . a neutral magistrate would likely have given such information,' and whether [a] defendant[ ] acted deliberately or recklessly in omitting the information from the warrant affidavits." Id. (internal quotation marks and citations omitted).

Silano challenges the contents of the Warrant Affidavit in a number of ways. First, she disputes that she ever directly threatened Chetlen or told Wheeler that she threatened Chetlen. See Pl.'s Obj. Mot. Dismiss 5–6. Second, Silano argues that Wheeler failed to indicate in his Warrant Affidavit that the state's attorney had denied a warrant application based on previous comments that Silano made to Chetlen – comments made during the incident about which Silano had filed an internal affairs complaint against Silva. Third, Silano argues that Wheeler failed to speak with a witness whom she identified. See Pl.'s Obj. Summ. J. 5; Pl.'s Obj. Mot. Dismiss 8.

15

Finally, Silano argues that her internal affairs complaint against Wheeler evidences his motivation to lie in his affidavit and act maliciously towards her.  Pl.'s Obj. Mot. Dismiss 18–19.

Even if Wheeler had included all of the information that Silano identifies, there can be no genuine dispute that a magistrate would have found probable cause.  First, Chetlen provided a sworn statement to Wheeler, reporting that Silano had threatened to shoot him and that he was scared Silano would follow through with the threat.  <u>See</u> Def.'s Rule 56(a)1 Statement ¶ 10; Def.'s Ex. F.  Further, while Silano denies ever threatening Chetlen directly or informing Wheeler that she had done so, she admits that she told Wheeler "that if he was not going to instruct Mr. Chetlen to stay away from [her house] or arrest him for his actions . . . , the next time he was in or around her home, she would shoot [Chetlen]."  Pl.'s Obj. Mot. Dismiss 5–6.  A threat stated to the police – for instance, whereby one individual tells the police that she will harm another unless the police intervene in a specified way – may nonetheless be made "in reckless disregard of the risk of causing . . . terror" when it is communicated (presumably, by the police) to the intended victim.  <u>See</u> <u>Walczyk</u>, 496 F.3d at 159.  <u>But see</u> <u>State v. Walczyk</u>, 76 Conn. App. 169, 181–82 (2003) (reaching the contrary conclusion that "[a] statement to a police officer that *the police* needed to act to avoid a 'bloodbath' cannot be the basis of probable cause to believe that the defendant, at that time or in the immediate future, would engage in threatening behavior" (emphasis in original)).  This is especially so where, as here, the individual making the threat has made other threats in

the past or has otherwise engaged in conduct that lends credibility to the threat.  See
Walczyk, 496 F.3d at 158–59.

Second, Wheeler's failure to indicate that Silano's previous comment about
shooting Chetlen did not result in an arrest warrant is simply immaterial to the probable
cause determination at issue in this case.  See id. at 161 ("Defendants' failure to
disclose that none of [plaintiff's]  prior conduct had resulted in a conviction for
threatening . . . is hardly relevant.").  It was the fact that Silano had previously stated
that she would shoot Chetlen that mattered.  See id.  ("It was the particulars of the
[plaintiff's] past conduct in using or threatening to use firearms to resolve disputes that
was critical.").

Third, Wheeler's failure to speak with an alleged witness or to identify such
witness in his Warrant Affidavit is also immaterial, because Silano admits that she told
Wheeler she would shoot Chetlen unless the TPD intervened.  See Pl.'s Obj. Mot.
Dismiss 5–6.  If anything, the witness's confirmation of Silano's story would only bolster
the evidence in support of probable cause.  Moreover, Wheeler was not required to
investigate or interview every potential witness.  See Ricciuti, 124 F.3d at 128.  Finally,
the fact that Silano had filed an internal affairs complaint against Wheeler is irrelevant to
the question of whether probable cause existed.

Because there is no genuine issue of material fact with respect to Wheeler's
probable cause determination, Wheeler is entitled to summary judgment on Silano's
false arrest and malicious prosecution claims relating to the January 10, 2011, incident.
In particular, the following undisputed facts establish, as a matter of law, probable cause

17

to arrest Silano for threatening in the second degree:  Wheeler was aware that Silano possessed a gun, and that she had threatened to kill Chetlen a few months earlier.  He was aware of the numerous – and, apparently, escalating – conflicts between them, of Silano's extreme frustration with Chetlen, and of Silano's statement that she would shoot Chetlen unless the police intervened in the way that she desired.[8]  Based on these undisputed facts, Wheeler had probable cause to arrest Silano, as a matter of law, for making a threat with "reckless disregard of the risk of causing  . . . terror," Conn. Gen. Stat. § 53a-62(a)(3),[9] and no reasonable juror could find in Silano's favor on her false arrest or malicious prosecution claims with respect to the January 10, 2011, incident.[10]

2.    The Incident on February 8, 2011

Wheeler argues that, as a result of the incident on February 8, 2011, he had probable cause to arrest Silano for threatening in the second degree; reckless

_____

[8] Silano moves for court-appointed counsel and requests that discovery be reopened so that she can investigate the authenticity of the ICOP recoding on which Wheeler relies.  See Pl.'s Obj. Summ. J. 8.  The court denies those requests because Wheeler is entitled to probable cause as a matter of law even according to Silano's recollection of the facts.

[9] Wheeler also argues that he had probable cause to arrest Silano for breach of peace in the second degree.  See Conn. Gen. Stat. § 53a-181(a).  In relevant part, section 53a-181 states that "[a] person is guilty of breach of peace in the second degree when, with intent to cause inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, such person . . . threatens to commit any crime against another person or such person's property."  Id.  For substantially the same reasons that Wheeler had probable cause to arrest Silano for threatening in the second degree, he also had probable cause to arrest Silano for breach of peace in the second degree.

[10] Even if Wheeler did not have probable cause, he would still be entitled to qualified immunity because, viewing the evidence with all inferences in Silano's favor, Wheeler had arguable probable cause to arrest Silano.  See Escalera v. Lunn, 361 F.3d 737, 473 (2d Cir. 2004) ("Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (internal quotation marks omitted)).

endangerment; breach of peace in the second degree; and carrying a pistol or revolver without a permit.  The court concludes that, based on the undisputed facts, Wheeler had probable cause as a matter of law to arrest Silano for, at the least, breach of peace in the second degree and carrying a pistol or revolver without a permit.

Wheeler relied on the statements of Chetlen and Verespy in determining that he had probable cause to arrest Silano.  See Def.'s Mem. Supp. Summ. J. (Doc. No. 125-1) 23–24.  Chetlen reported to Wheeler that, as he was bringing patio furniture to his van from the clubhouse, he saw Silano leaning out of the driver-seat window of a black SUV while pointing a silver-colored gun at him.  See Def.'s Ex. K.  He further stated that, as he turned to run, Silano said, "You better run you bastard.  Keep away from my house.  You and Honis are going to get yours."  Id.  Chetlen told Wheeler that he ran into a closet in the clubhouse.  Id.  Further, Verespy reported that, as he was behind Chetlen carrying cushions to Chetlen's car, he heard Chetlen say, "She has a gun."  Def.'s Ex. L.[11]  Verespy stated that, when he looked up, he saw "a person in a dark car with something in . . . their [sic] hand," so he ran into the clubhouse.  Id.  Silano does not dispute that Verespy and Chetlen provided these reports, and she acknowledges that they served as the basis of Wheeler's probable cause determination.  See  Pl.'s Rule 56(a) Statement (Doc. No. 131) ¶ 12, at 25; see also Note 1, supra.

---

[11] The court agrees with Wheeler that this would be admissible as an excited utterance.  See Fed. R. Evid. 803(2) (stating that "statement[s] relating to a startling event or condition, made while the decalarant was under the stress or excitement that it caused" are not excluded by the rule against hearsay).

The undisputed record demonstrates that Wheeler had probable cause to arrest Silano.  Chetlen, the putative victim of Silano's alleged conduct, reported to Wheeler that Silano pointed a silver-colored gun at him.  See Def.'s Ex. K.  While Verespy did not state that he saw a gun, his statement does significantly corroborate Chetlen's statement:  he confirmed that Chetlen believed Silano had a gun immediately after seeing her, and he stated that he saw someone holding something in his or her hand out of a car window.  Def.'s Ex. L.  The court acknowledges that the ongoing disputes between Silano and Chetlen may have given Wheeler reason to suspect the truthfulness of Chetlen's statement.  However, Wheeler also had Verespy's corroborating statement.  Moreover, as far as Chetlen's credibility was concerned, the history between Silano and Chetlen cuts both ways.  On one hand, the ongoing disputes between the two might have given Chetlen a reason to lie about Silano to get her in trouble.  On the other hand, the very same disputes make it more believable that Silano would have pointed a gun at Chetlen.  This is especially true in light Wheeler's knowledge that Silano possessed a firearm and had threatened to shoot Chetlen at least twice within the past several months.

Silano argues that Wheeler failed to obtain video surveillance capturing the incident, which she claims is entirely exculpatory.  See, e.g., Pl.'s Obj. Summ. J. 16.  As an initial matter, there is no evidence that Wheeler knew such video was available when he made his probable cause determination.  See Def.'s Ex. J, at 2 ("Officer Lee checked with [Clubhouse] staff.").  Cooney did state that he had told an officer about it, but there is no evidence in this record that this officer was Wheeler or that this officer told

20

Wheeler about Cooney's information.  See Pl.'s Ex. 131-U, at 13–14.  Silano states that she personally "observed and heard [Wheeler] questioning . . . Chetlen about . . . the surveillance videos," see Pl.'s Ex. 131-A, Silano Aff. ¶ 34, but she does not say that Chetlen confirmed such video existed.

Even with that aside, and even assuming the unauthenticated surveillance video is what Silano says it is, it would not have overcome Wheeler's probable cause to arrest Silano.  The video shows the following:  It is dark outside, and snow covers the ground; indeed, snow-covered ground fills most of the frame.  A vehicle – apparently Silano's – pulls into a parking lot and parks next to another car.  Silano's car stays in the parking lot with its headlights – maybe even high beams – turned on.  Eventually, on the right edge of the frame, a man – apparently Chetlen – appears, carrying what looks like cushions.  When the man looks up and sees the car with its headlights on, he is clearly frightened: he immediately backs away and then rushes in the direction from which he came.  As soon as Chetlen runs away, Silano's car quickly backs out of the parking spot and drives away.  Because of the snow, darkness, headlights, and position of the camera, no details of Silano's car are visible.  Silano is not visible, and it is impossible to tell whether or not she held a gun out the window.  See Pl.'s Ex. V, at 19:44:38– 19:46:20.

The video is exculpatory only in the sense that the viewer does not see Silano holding a gun.  However, nor does the viewer see Silano without a gun.  In fact, much of the video corroborates Chetlen's story: he was carrying cushions from the Clubhouse to the parking lot, and he was immediately frightened when he saw Silano.  The viewer

does not see any pillows tossed, but Chetlen is barely in the frame.  With or without access to this video, probable cause existed to arrest Silano in light of the undisputed facts that Chetlen provided a statement indicating that he saw Silano point a silver-colored gun at her; Verespy provided a statement that substantially corroborated Chetlen's statement; Wheeler knew of Silano's threats to shoot Chetlen in the recent past; and Wheeler knew that Silano possessed a gun.  Based on these undisputed facts, Wheeler, at the very least, had probable cause[12] to arrest Silano for "engag[ing] in . . . violent, tumultuous or threatening behavior in a public place,"[13] Conn. Gen. Stat. § 53a-182(1), and for "carry[ing] [a] pistol or revolver upon . . . her person . . . without a permit to carry the same," Conn. Gen. Stat. § 29-35.[14]

C.    Equal Protection

Finally, Wheeler argues that Silano's equal protection claim fails because she neither alleges nor provides evidence that any similarly situated individuals were treated differently.  The court agrees:  Silano has not alleged an equal protection violation, much less provided evidence upon which a reasonable jury could find such a violation.

---

[12] As with the arrest related to the incident on January 10, 2011, even if Wheeler did not have probable cause to arrest Silano on February 8, 2011, Wheeler had arguable probable cause.  See Escalera, 361 F.3d at 473.

[13] Even if the Clubhouse parking lot is not a public place, i.e., an "area that is used or held out for use by the public whether owned or operated by public or private interests," Conn. Gen. Stat. § 53a-181, Wheeler would have had probable cause to arrest Silano for disorderly conduct, which drops the "public place" requirement but is otherwise the same.  See id. § 53a-182; see also Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest.").

[14] While Wheeler did not confirm Silano's lack of a permit to carry until after the arrest, see Def.'s Rule 56(a)1 Statement ¶¶ 32, 35, Silano had told him on January 10, 2011, that she had no such permit.  See Def.'s Ex. E, 8:2–3 ("I don't have a license to carry, but [Chetlen] doesn't know that.").

Silano is unclear about whether she is making a selective enforcement claim or a class-of-one claim.  In either case, she fails to state a claim, and she fails to provide evidence that would support a reasonable jury's finding in her favor.  To state a class-of-one claim, the plaintiff must allege that: (1) she was intentionally treated differently from other similarly situated individuals, and (2) there was no rational basis for the difference in treatment.  See Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2003) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  "[A] class-of-one plaintiff must show . . . an extremely high degree of similarity between [herself] and the persons to whom [she] compare[s] herself . . . ."  Doninger v. Niehoff, 527 F.3d 41, 53 (2d Cir. 2008) (internal quotation marks omitted).

To state a selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must allege: "(1) [that] [she], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004) (quoting Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999)).  "Courts in the Second Circuit are split as to whether the 'extremely high degree of similarity' standard articulated for class-of-one claims also applies to selective enforcement claims."  Musco Propane, LLP v. Town of Wolcott, 891 F. Supp. 2d 261, 274 (D. Conn. 2012), aff'd sub nom. Musco Propane, LLP v. Town of Wolcott Planning & Zoning Comm'n, 536 F. App'x 35 (2d Cir. 2013).  A number of courts have required plaintiffs to show only that "it and

23

its comparators are similarly situated in all material respects, or that a prudent person looking objectively at the incidents would think them roughly equivalent." Id. (internal quotation marks omitted).

Under either standard, Silano has failed to allege that similarly situated individuals were treated differently. Silano's theory of selective enforcement is that Chetlen and Verespy "provided . . . three entirely different versions of [her] actions on February 8, 2011, and despite such evidence, Wheeler has failed to enforce the law against either individual." Am. Compl. ¶ 25. Even if Chetlen and Verespy provided false statements, as Silano alleges, they are not similarly situated as a matter of law. Silano admits that she told Wheeler that she would shoot Chetlen if he ever came around her home. Id. ¶ 8. Neither Chetlen nor Verespy's actions, even if illegal, threatened using deadly force. Committing trespass is quite different from shooting someone. The very fact that Chetlen and Verespy were alleged to have done something illegal does not make them similarly situated to Silano.

Given that Silano's allegations fail to state an equal protection violation, it is not surprising that Silano has failed to come forward with evidence to defeat Wheeler's Motion for Summary Judgment. Regarding a class-of-one claim, based on the undisputed facts, no reasonable juror could find that Silano was similarly situated to Chetlen or Verespy. Even if she was, the difference between Wheeler's treatment of Silano and Chetlen or Verespy is entirely rational. See Olech, 528 U.S. at 564 (requiring class-of-one plaintiffs to show "no rational basis for the difference in treatment"). Silano threatened to shoot Chetlen on at least two occasions. Wheeler

24

was aware of evidence that Silano pointed a gun at Chetlen – evidence that supported probable cause to arrest her.  See Section IV.B., supra. There is no evidence of Chetlen or Verespy similarly threatening Silano.

Silano's selective treatment claim fails for substantially the same reason: there is no evidence that she is similarly situated to anyone else.  Cf. Anderson v. Anheuser Busch, Inc., 229 F.3d 1135 (2d Cir. 2000) (unpublished table decision) ("[Comparators] were not similarly situated to [the plaintiff] because they did not engage in the same misconduct as he." (internal quotations and alterations omitted)).

Therefore, Wheeler's Motion for Summary Judgment is granted on Silano's equal protection claims, and his Motion to Dismiss is terminated as moot.

D.     Intentional Infliction of Emotional Distress

Silano's Amended Complaint makes vague reference to an intentional infliction of emotional distress ("IIED") claim.  See Am. Compl. ¶ 29.  To the extent Silano asserts this claim, the court grants summary judgment to Wheeler.

A plaintiff cannot make an IIED claim based on an arrest made with probable cause.  See Brooks v. Sweeney, 299 Conn. 196, 209 (2010) ("[T]he plaintiff's arrest was supported by probable cause and, therefore, . . . [the defendant] is entitled to judgment as a matter of law on the . . . intentional and negligent infliction of emotional distress claims.").  Here, Silano's IIED claim is based on an arrest supported by probable clause, so her claim fails.

III.    **CONCLUSION**

For the foregoing reasons, the court **GRANTS** Wheeler's Motion for Summary Judgment (Doc. No. 125) and **DENIES** Silano's Motions for Summary Judgment (Doc. Nos. 104 & 130).  Having granted Wheeler's Motion for Summary Judgment, the court **TERMINATES** Wheeler's Motion to Dismiss as moot.


**SO ORDERED**.

Dated at New Haven, Connecticut, this 5th day of February, 2015.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

26